In re MO-SE-CHE-HE'S ESTATE.

CANNON et al v. HUM-PAH-TO-KAH et al.

KENWORTHY'S HEIRS v. HUM-PAH-TO-KAH et al.

No. 31037.    Sept. 20, 1949.

Rehearing Denied Dec. 20, 1949.

Second Petition for Rehearing Denied May 2, 1950.

*217 P. 2d 505.*

H. P. White, Robert Stuart, C. S. McDonald, Frank Files, and L. M. Colville, all of Pawhuska, and W. J. Mahan, of Fairfax, for plaintiffs in error Joseph Cannon et al.

D. E. Johnson and Harland D. Johnson, both of Fairfax, for plaintiffs in error Heirs of Peter Kenworthy.

L. R. Stith, of Fairfax, Tillman & Tillman and John L. Arrington, all of Pawhuska, and George F. Short, Welcome D. Pierson, George E. Fisher, and John F. Reed, all of Oklahoma City, for defendants in error Hum-pah-to-kah et al.

O'NEAL, J. Mo-se-che-he, Osage Indian allottee No. 34, died on the 30th day of June, 1934, while a resident of Osage county, leaving an estate, having a situs in Osage county, Oklahoma, which is a restricted Osage Indian estate, Mo-se-che-he having been a fullblood Osage Indian and never had issued to her a certificate of competency.

Decedent left surviving her no issue, no father, no mother, no brother, no sister, nor any descendants of any deceased child or children.

There was a controversy as to whether or not she left a will and whether or not she left surviving her a husband. Those questions were before this court and it was determined that Mo-se-che-he left surviving her a husband —Albert Fierro, otherwise known as Jack Rogers, and that she had executed a will while she was single and before her marriage to Albert Fierro (Jack Rogers), and that by said marriage the will was revoked. In re Mo-se-che-he's Estate, Red Eagle et al. v. Rogers et al., 188 Okla. 228, 107 P. 2d 999.

Pending the litigation above mentioned, joint letters of administration were issued to Leah Duncan and W. C. Tucker.

About May 19, 1938, Albert Fierro (Jack Rogers) filed in the county court of Osage county, in a probate proceeding in the Mo-se-che-he Estate, his petition for determination of heirship. Therein he set out or described the property comprising the estate and alleged he was the surviving husband and sole heir of Mo-se-che-he and entitled to inherit the whole estate. He further alleged that there were certain other persons (naming them) claiming relationship to Mo-se-che-he and claiming the right to inherit.

Some seven individual Osage Indians, or groups of Osage Indians, contested the right of Albert Fierro (Jack Rogers) to inherit, on the ground that he was not of Indian blood, and under the Act of Congress of February 27, 1925, relating to inheritance from Osage Indians, could not inherit from an Osage Indian of more than half blood who had not received a certificate of competency. Each of said individual claimants, or groups of claimants, claimed to be the next of kin to Mo-se-che-he, and entitled to inherit to the exclusion of all other claimants. Among these individual claimants, or groups of claimants, were: (1) Peter Kenworthy (Osage Indian Allottee No. 316), who was living at the time Mo-se-che-he died. He claimed to be a nephew of Mo-se-che-he. (2) E-ne-op-pe (Osage Indian Allottee No. 428), who was living at the time Mo-se-che-he died. She claimed to be a first cousin of Mo-se-che-he. Joseph Cannon (Osage Allottee No. 106), who claimed to be a first cousin, and Alex Cannon (Osage Indian Allottee No. 109), who claimed to be a first cousin of Mo-se-che-he. (3) Hum-pah-to-kah (Osage Indian Allottee No. 70), Ralph Hamilton (Osage Indian Allottee No. 72) and Donnie Whitehorn (Osage Indian Allottee No. 159). This group claimed to be second cousins of Mo-se-che-he.

The other four individual Osage Indian claimants, or groups of claimants, dropped out of the case, either by withdrawal or failure to appeal, and are not involved in this appeal.

While the proceedings were pending, E-ne-op-pe died and the cause was revived as to her in the name of Johnie Mohon, her executor, with the will annexed, and her heirs, legatees and devisees.

Peter Kenworthy died pending the proceedings and the case was revived as to him in the name of L. A. Binkley, his executor and his heirs, legatees and devisees.

Guardians ad litem were appointed for certain minor children of the original claimants who died pending the proceedings. The matter was set for hearing in the county court, but upon objection of some of the claimants, an order was entered continuing the matter until after a final decision in the case of Red Eagle et al. v. Rogers et al., supra.

The mandate of the Supreme Court in the Red Eagle case was received and spread of record in the county court December 31, 1940. Thereafter the joint administrators filed their accounts and the matter of determination of heirship was set for hearing March 31, 1941.

After the hearing the county court found and held: (1) that Albert Fierro (Jack Rogers) failed to establish that he was of Indian blood, and that he was not an heir of Mo-se-che-he and that he was not entitled to participate in or inherit any part of the estate of Mo-se-che-he; (2) that E-ne-op-pe (deceased), Ralph Cannon, Alex Cannon, and Peter Kenworthy (deceased) were first cousins and next of kin to Mo-se-che-he; (3) that claimants Hum-pa-to-kah, Ralph Hamilton and Donnie Whitehorn, and each of them, failed to show by the evidence any kinship sufficiently close to make them or either of them legal heirs or heir to Mo-se-che-he, as against the first cousins.

The county court found against all other claimants and ordered the estate to be distributed: to the heirs and devisees of the estate of E-ne-op-pe, one-fourth; to Joseph Cannon, a first cousin, one-fourth; to Alex Cannon, a first cousin, one-fourth; and to the heirs, legatees, and devisees of Peter Kenworthy, a first cousin who died subsequent to the death of Mo-se-che-he, according to the terms and conditions of his last will and testament, one-fourth.

Appeals were perfected in the district court by Albert Fierro (Jack Rogers), Hum-pah-to-kah, Ralph Hamilton, Donnie Whitehorn and other claimants. The district court, on appeal, after trial de novo, found and held that Albert Fierro (Jack Rogers) is not of Indian blood and, therefore, not entitled to inherit and that the legal heirs of Mo-se-che-he are: Hum-pah-to-kah, Ralph Hamilton, and Donnie Whitehorn, second cousins, each to take one-third part.

From this finding and judgment Albert Fierro (Jack Rogers) appealed to this court. Joseph Cannon, Alex Cannon, the executor of E-ne-op-pe, her heirs, legatees, devisees, and the heirs, legatees and devisees of Peter Kenworthy, filed cross-petitions in error. On December . . . , 1948, Albert Fierro (Jack Rogers) dismissed his appeal and the matter is now pending on the cross-appeals of Osage Indian claimants Joseph Cannon, Alex Cannon, and the heirs of E-ne-op-pe and the cross-appeal of the heirs of Peter Kenworthy.

Joseph Cannon and Alex Cannon claim to be first cousins of Mo-se-che-he and the heirs of E-ne-op-pe claim that she was a first cousin of Mo-se-che-he. They all claim through the father of Mo-se-che-he, and they are referred to as the "Cannon Group." The heirs et cetera of Peter Kenworthy claim that he was a nephew of Mo-se-che-he also on the father's side, but by different name, and they are referred to as the "Kenworthy Group." Defendants in error claim as second cousins through the mother of Mo-se-che-he and they are referred as to the "Hum-pah-to-kah Group."

There are many assignments of error but the appellants present but one question: that the findings of the trial

court are clearly against the weight of the evidence and the judgment is contrary to law.

In the district court there was evidence consisting of the testimony of some fifty witnesses and documentary evidence covering about 1,050 typewritten pages in the case-made.

In the contest between the several Indian claimants, the court made separate findings of fact and conclusions of law. The first three findings of fact set forth the groups of claimants and their respective claims as to relationship of Mo-se-che-he and how it arose. These findings are not assailed and the briefs of the respective parties follow these findings.

The first finding goes to the claims of the Kenworthy Group and is:

"By them it is claimed that Peter Kenworthy was the son of Mo-se-che-he's half-brother on her father's side. It is claimed that the father of Peter Kenworthy, Joe Tasso, was the son of Pah-kah-shon, Wah-kah-she-wah-tsa, Wah-go-she-wet-tsa or Mo-shon-hah, who was one and the same person, who was also the father of Mo-se-che-he, Joe Tasso's mother being He-ah-to-me. There is no other claimant who claims to be as closely related to Mo-se-che-he as nephew or niece and, therefore, if this claim of kinship has been established by the evidence, the heirs and personal representatives of Peter Kenworthy would take the entire estate."

, The second finding goes to the claims of the Cannon Group and is:

"It is the claim of this set of claimants that Mo-se-che-he's father had two brothers, Che-sho-wah-ti-an-kah, who was the father of Alex Cannon, and Nun-tsa-wah-hu, who was the father of E-ne-op-pe and Joseph Cannon. If the claim of Peter Kenworthy is not substantiated, and if the claim of the Cannons and E-no-op-pe's heirs is substantiated then they, the three of them, inherit the entire estate in three equal parts, one to Alex Cannon, one to Joseph Cannon, one to the heirs of E-ne-op-pe."

The third finding goes to the Hum-pah-to-kah Group and is:

"There is a third set of claimants, namely, Hum-pah-to-kah, Osage Allottee No. 70, Ralph Hamilton, Osage Allottee No. 72, and Donnie Whitehorn, Osage Allottee No. 159, who claim to be second cousins of the deceased, Mo-se-che-he, on her mother's side. It is their claim that Mo-se-che-he's mother, Hon-sah-me, had three sisters and a brother, Gra-to-in-sah, Gra-to-me-tsa-he, Gra-to-me and Do-don-kah-she. That Gra-to-in-sah had a child named Nah-kah-sah-me, who had a daughter named Hum-pah-to-kah, one of the claimants in this case and second cousin to Mo-se-che-he. That Gra-to-me had a son named Wah-shah-she-wah-ti-an-kah, who died without issue. That Hon-sah-me had Mo-se-che-he, the decedent in this case, who died without issue. That Do-don-kah-she had four daughters and a son named: Gra-to-in-sah, Gra-to-me-tsa-he, Gra-to-me, Hon-sah-me and Che-ke-cola. That Gra-to-in-sah, Gra-to-me-tsa-he and Gra-to-me died without issue, and that Hon-sah-me had a son, Ralph Hamilton, claimant in this case, second cousin to Mo-se-che-he. Che-ke-cola had a daughter, Donnie Whitehorn, claimant in this case, second cousin to Mo-se-che-he. If Peter Kenworthy's claim has not .been substantiated his heirs cannot inherit and if Joseph Cannon, Alex Cannon and the heirs of E-ne-op-pe have not made their case and cannot inherit, and if these three have proved they are second cousins of the decedent, then they in equal share, one-third to each, inherit the entire estate."

The trial court then makes the following frank statement:

"To make a proper presentation of the facts in proof in this case and to reach a satisfactory conclusion, one upon which the mind settles and rests with confidence, is fraught with much difficulty. The testimony in the main is fragmentary, indirect and is seldom given as within the knowledge of the person testifying."

The trial court then points out:

"Recourse has been had, therefore, to records and documents and to hearsay testimony, family history and tra-

dition, as well as facts and circumstances bearing thereon consisting of data which point to or rather indicate family relationships."

The court then finds that the evidence seem quite satisfactory that the claimants Hum-pah-to-kah, Ralph Hamilton, and Donnie Whitehorn are second cousins to decedent, Mo-se-che-he, on her mother's side as claimed by them, and: "In fact, this not only is proved by the evidence but it does not seem to be seriously controverted by anybody."

The court then finds:

"In the case of the Cannon group, there is grave doubt if any of these claimants is related at all to the decedent, Mo-se-che-he. The court finds, therefore, that the evidence fails to show the claimants in this group are first cousins of the decedent, Mo-se-che-he, in fact, that they are in any way related to the decedent."

The conclusion of the court is:

"It is the conclusion of the court, therefore, that the only set of claimants who have established, by satisfactory proof, that they are kin to the decedent in any degree are the second cousins, Hum-pah-to-kah, Osage Allottee No 70, Ralph Hamilton, Osage Allottee No. 72, and Donnie Whitehorn, Osage Allottee No. 159, and that they inherit the whole of said estate in equal parts, one-third to each."

Judgment was entered in accordance with the findings and conclusion.

The Cannon Group contends that these findings are clearly against the weight of the evidence and that the clear weight of the evidence is that the Cannon Group are first cousins to decedent, Mo-se-che-he.

The Kenworthy Group also contends that the findings of the trial court are against the clear weight of the evidence and that the clear weight of the evidence is that Peter Kenworthy was a nephew of decedent, Mo-se-che-he, and that he was entitled to inherit all

the estate and that, he having died after the death of Mo-se-che-he, his heirs, legatees and devisees are entitled to the whole of said estate. This requires an examination of all the evidence consisting of some 1,050 typewritten pages of oral testimony and documentary evidence. It is obvious that the evidence contained in this long record cannot be reviewed in detail. The oral testimony, as stated by the trial court, is fragmentary and indirect and seldom given within the knowledge of the person testifying. Parts of it, however, are borne out or corroborated to a certain extent by documents made in the course of the administration of the affairs of the Osage Indian Tribe from the date of their removal from the State of Kansas to the Osage Reservation in the State of Oklahoma, and the payment by the Government of annuities to the Osage Indians on the Allotment Rolls and other records.

It appears that the first pay roll showing a list of names of Osage Indians entitled to receive annuity payments was made about the year of 1871 (about the time of the removal of the Osage Indians to what is now Osage county, Oklahoma).

In the earlier rolls it appears that when a payment was due, the heads of the various Indian families would appear at the agency and give the name of the clan to which he belonged and his or her name to a clerk or other employee of the agency. The Osage Indians had no alphabet and no written language, hence, there would be no way of spelling the name in the Indian language. The clerk would write the name in English, spelling it as nearly as possible according to the sound or sounds given by the Indian. The Indian would then give the number of Indians in his family and this would show the number of men, women and children, but would not give their names. Payment would be made to the head of the family for the entire family. That is about all the rolls show from the year of 1871 to 1878.

Beginning with 1878, and thereafter, the head of each family, in most cases, was required to give the name of the clan to which he belonged, his name, and the name, relationship and age of each member of his family. These were not accurate in every case and from time to time the spelling of the various Indian names would vary. Sometimes there would be a complete change of the name of the head of the family, but in most cases identity could be traced by the names, relationship, number, and ages of the members of the family shown by the next previous payment. When an Indian woman married and thereby became the member of a different family, this fact would, as a rule, be noted on the rolls.

From the oral testimony, aided by such records as were available, it appears fairly certain that defendants in error, Hum-pah-to-kah, Ralph Hamilton (Indian name, Sin-tsa-hu) and Donnie Whitehorn (Indian name, Gro-tah-su-ah) are second cousins to decedent, Mo-se-che-he, and that the relationship is through the mother of Mo-se-che-he; that the common ancestors were Gron-ah-ke-a (also known as Do-don-ka-she) and He-ah-to-me, husband and wife; that Gron-ah-ke-a and He-ah-to-me had three (and possibly four) daughters and one son; the names of the three daughters were: Gro-to-in-sah; Gro-to-me and Hon-sah-me; the name of the son was Do-don-kah-she. This is the same name as one by which his father, Gron-ah-ke-a, was known, and in some places of the record he is referred to as Do-don-ka-she (the younger); that Gro-to-in-sah, the first or oldest daughter of Gron-ah-ke-a and He-ah-to-me, had a daughter whose name was Nah-kah-sah-me and that Hum-pah-to-kah is the daughter of said Nah-kah-sah-me; that Gro-to-me, the second daughter of Gron-ah-ke-a and He-ah-to-me, had a son named Wah-sho-she-wah-ti-an-kah, and that he died without issue; that Hon-sah-me, the third daughter of Gron-ah-ke-a and He-ah-to-me, had one daughter whose

name was Mo-se-che-he, the decedent herein. That makes Hum-pah-to-kah a second cousin to Mo-se-che-he.

The son of Gron-ah-ke-a and He-ah-to-me (Do-don-ka-she), also referred to as Do-don-ka-she (the younger), had a daughter by the name of Hon-sah-me. This name is the same as that of the mother of Mo-se-che-he, but she was younger than the mother of Mo-se-che-he. This younger Hon-sah-me had one son, Sin-tsa-hu (Ralph Hamilton); he was also the second cousin to Mo-se-che-he. Do-don-ka-she (the younger) and the son of Gron-ah-ke-a and He-ah-to-me, had a son named Chi-ke-cola, and Chi-ke-cola was the father of Donnie Whitehorn, whose Indian name is Gro-tah-su-ah. That makes her a second cousin to Mo-se-che-he, the decedent.

The trial court so found and it cannot be said that these findings are clearly against the weight of the evidence. They are in accord with the weight of the evidence and must stand. The relationship is through the mother of Mo-se-che-he. However, the fact that the Hum-pah-to-kah Group are second cousins to Mo-se-che-he, the decedent, does not necessarily show that they are the next of kin to decedent. They are not the next of kin if the evidence sustains the claim of the Kenworthy Group, that Peter Kenworthy was the nephew of Mo-se-che-he on his father's side, as a nephew is closer kin than a second cousin.

Further, if the Kenworthy Group failed in their claim, the Hum-pah-to-kah Group would still not be entitled to inherit if the weight of the evidence sustains the claim of the Cannon Group that they are first cousins to Mo-se-che-he on their father's side.

First, we consider the evidence as to the claim of the Kenworthy Group. It appears that all the claimants now agree that the father of decedent, Mo-se-che-he, was named Wah-kah-she-wah-tse. There is some contention as

to the correct spelling of the name. It appears that this name was spelled some three or four different ways, but all having substantially the same sound, and it is plain that there is a variation in the spelling of the name of the same person. The family history register, a part of the records kept by the Osage Indian Agency, shows that the father of Mo-se-che-he was Wah-kah-she-wah-tse, who was dead in 1901, the year this record was made up. It also shows the name of the mother of Mo-se-che-he to be Hon-sah-we or Hon-sah-ne or Hon-sah-me. She was dead in 1901 when this record was made up. The record also shows that Mo-se-che-he was married in the winter of 1886 to Wah-sho-sah, Allotee No. 39 and that his father's name was Mo-she-tah-moie, and that his mother's name was E-ne-op-pe, but this E-ne-op-pe could not have been the same person as the E-ne-op-pe who it is claimed was one of the first cousins of Mo-se-che-he.

The individual history card of Mo-se-che-he shows that her father's name was Wah-kah-she-wah-tse and that her mother's name was Hun-sah-we. At different places in the record there is a difference in the spelling of the names of Mo-se-che-he's father, but, taken as a whole, the record clearly shows a name very similar to that where it is spelled "Wah-kah-she-wah-tse," as it appears in the roll of 1871. At that time and down to 1878 only heads of families signed the pay roll. The head of the family would sign for the whole family, but the names of the individuals comprising the family were not given. Only the number of men and number of women and number of children would be given.

In the May, 1871, pay roll one Wa-cah-she-wo-sce (or see) with the Big Chief Band under the number 32 signed the pay roll. He signed by mark for four men, three women and four children. None of the names or ages of the men, women or children were given. Again, in the third and fourth quarter payments of 1871, Wa-ca-she-wa-tsa, father signed the pay roll with the Big Chief Band. He signed for four men, three women, and four children. He signed by mark and apparently a clerk wrote the name. The name is not spelled the same as in the May, 1871, pay roll, but it was evidently the same person. In the June, 1872, payments, Wah-ca-she-wo-tsa with the Big Chief Band under number 31 signed the pay roll for three men, four women and four children. Again the name is spelled a little differently, but it is evident that he was the same person as Wah-cah-she-wah-tsa who in the third and fourth quarters of 1872 with the Big Chief Band under number 30 signed the pay roll. He signed for three men, four women and four children. In the spring payment of 1873 with the Big Chief Band under the number 30, Wah-kah-she-wa-tsa signed the pay roll. The original spelling of the second syllable of the name seemed to have been "ka" in ink. Apparently the letter "h" had been added in pencil. He signed for two men, one woman and two children. No such name appears on the pay roll with any band thereafter. What became of him is not shown by any record.

It is the contention of the Kenworthy Group that the Indian name of Peter Kenworthy's father was Wah-she-ho-tsa, whose English name was Joe Tasso. The family history register bears them out. The same record shows that Joe Tasso's mother's name was He-ah-to-me. Other records disclose that his father's name was Pah-kah-shu (sometimes referred to as Pah-kah-*shon*) and that the name of Peter Kenworthy's mother was Gro-to-me. As between the Kenworthy Group and the Hum-pah-to-kah Group it was stipulated that this Gro-to-me was not the Gro-to-me claimed by the Hum-pah-to-kah Group to have been the daughter of Gron-ah-ke-a and He-ah-to-me and the sister to Hon-sah-me, the mother of Mo-se-che-he.

The Kenworthy Group further claims that the father of Joe Tasso was the same person as Wah-gah-she-wah-tse,

the father of Mo-se-che-he. It was necessary for the Kenworthy Group to prove that the father of Joe Tasso was the same person as Wah-kah-she-wah-tse, the father of Mo-se-che-he, in order to show that Peter Kenworthy was the nephew of Mo-se-che-he. In this they failed. By records made long before this contest arose, the other facts and circumstances in evidence, that could hardly be true.

We are not unmindful of the fact that there is much evidence of kinship having been spoken of in the various families involved, but there is no direct evidence that the father of Joe Tasso was the same person as Wah-kah-se-wat-tse, the father of Mo-se-che-he. The record clearly shows that Mo-se-che-he was born January 1, 1869. Her name first appears on the pay roll in 1878. She was then nine years old. These records are not always accurate as to the ages of the members of the tribe, but her name appears on each pay roll from 1878 to 1886; at which time she was married, and all of these rolls show that she was born in 1869. There is abundant evidence in the record that her father died when she was a small child, four or five years of age. That would be about 1873, the time when Wah-kah-se-wat-tse's name last appears on the pay roll.

The family history records show that Pah-ka-shon was the father of Joe Tasso; by the heirship proceedings in the estate of Joe Tasso, his father's name is shown to be Pah-ka-shon and that he died before 1873. Aside from the records, one witness, Roan Horse, testified that he knew Joe Tasso and Pah-kah-shon well and that Pah-kah-shon was Joe Tasso's father. He further testified that the last time he remembered having seen Pah-kah-shon, Roan Horse was about 20 years old. The records show that Roan Horse was born about 1878. That would show Pah-kah-shon as living as late as 1898. However, that testimony is in conflict with the record in the matter of the determination of the heirship of Joe Tasso which shows that Joe Tasso's father's name was Pah-kah-shon and that he died before 1873. It is shown from the record of the spring 1873 pay roll that Wah-kah-she-wa-tsa was alive and signed a pay roll in the spring of 1873.

It thus appears from the record that Pah-kah-shon (or shu) was the father of Joe Tasso; he could not have been the same person as Wah-kah-she-wah-tse, the father of Mo-se-che-he. Therefore, the findings of the trial court that Peter Kenworthy was not the nephew of Mo-se-che-he is not clearly against the weight of the evidence.

We next consider the evidence as to the claim of the Cannon Group. Their claim is that an Osage Indian named Nun-hun-tah-pah was the common ancestor; that he had three sons named Che-sho-wah-ti-an-kah, Nun-tsa-wah-hu and Wah-kah-she-wah-tse; that Alex Cannon, whose Indian name was Pah-pah-ah-hah, was the son of Che-sho-wah-to-an-kah; that E-ne-op-pe was the daughter of Nun-tsa-wah-hu and that Joseph Cannon, whose Indian name was Num-pah-se, was the son of Nun-tsa-wah-hu, and that Mo-se-che-he (deceased) was the daughter of Wah-kah-she-wah-tse. That, if true, would make Alex Cannon, E-ne-op-pe, and Joseph Cannon all first cousins to Mo-se-che-he.

They had no difficulty in proving that Alex Cannon and Joseph Cannon were grandsons of Nun-hun-tah-pah and that E-ne-op-pe was his granddaughter.

There is much conflict in the evidence as to whether Wah-kah-she-wah-tse, the father of Mo-se-che-he, was the son of Nun-hun-tah-pah, the alleged common ancestor.

The Cannon Group, like all the other claimants, asserts that Wah-kah-she-wah-tse (with numerous variations in the spelling of the name) was the father of Mo-se-che-he.

The Cannon Group, as well as the Hum-pah-to-kah Group introduced in evidence the family history record of Mo-se-che-he, a Government record, which shows:

14

"Mo-se-che-he F. Age 32, Full blood Osage. Wife. Married Winter 1886 Indian custom. Name of father, Wah-kah-she-wah-tse. Dead. Name of mother, Hon-sah-ne. Dead."'

That record was made in 1901 and means that the father and mother of Mo-se-che-he were both dead in 1901. Photostatic copy of the family register is in the record and it appears quite difficult to determine whether the mother's name was Hon-sah-*me* or Hon-sah-*we*. The individual history card of Mo-se-che-he was introduced in evidence, and is:

"Individual History Card

"Tribe, Osage (Big Chief) Sex, F. Allotment No. 34, Indian name, Mo-se-che-he. Father, Wah-kah-she-wah-tse. Mother, Hun-sah-we."

There the name of the mother appears as Hun-sah-we.

The family history card of Wah-sho-sha, husband of Mo-se-che-he, shows:

"Family History

| Of | Wah-sho-shah | Allotment No. 33 |
|---|---|---|
| | Name of Allottee | |

| Married, where | | By whom |
|---|---|---|

Indian Custom Date Winter 1886

If divorced, where

Date of decree

| Husband | Wah-sho-shah | |
|---|---|---|
| | Indian Name | English Name |
| Born | | Died |

| Husband's father | Moh-she-tah-moie | |
|---|---|---|
| | Indian Name | English Name |

| Husband's mother | E-ne-op-pe | |
|---|---|---|
| | Indian Name | English Name |

| Wife | Mo-se-che-he | |
|---|---|---|
| | Indian Name | English Name |

| Wife's father | Wah-kah-she-wah-tse | |
|---|---|---|
| | Indian Name | English Name |

| Wife's mother | Hun-tsa-me | |
|---|---|---|
| | Indian Name | English Name |

| Name Husband's sisters and brothers | (Big Chief Band) | " |
|---|---|---|

While the names are spelled differently in the record kept by the agency, there is no room for doubt as to the identity of the father and mother of Mo-se-che-he.

As stated by the trial court, there is much hearsay testimony, family history and tradition, together with evidence of conduct and participation in weddings and funeral services of the families involved, which points to, or indicates, family relationship, and that there is much evidence of kinship having been spoken of by persons in the various families involved, and of what was stated in their lifetime by some of the older members of the tribe who were long since dead. But when an Osage Indian speaks of relationship or kinship, he uses an Osage Indian word to designate the same and it may mean kinship as we understand it, and as it is understood in law, or it may mean a quite different thing. In this connection the trial court said:

"In fact if there is anything proved in this case that can be relied upon with assurance it is the fact that the Osage Indians of the generations involved in this proceeding used words expressing kinship which have a very different meaning from the kinship expressed as understood in the law and by the English speaking peoples."

The record does show that Nun-hun-to-pah had two sons, one of whom was named Che-sho-wah-ti-an-kah, and

the other named Nun-tsa-wah-hu. There is also evidence to show that Nun-hun-to-pah had a third son who was the younger brother of Che-sho-wah-ti-an-kah and Nun-tsa-wah-hu. There is evidence tending to show that his name was Wah-hah-sah-sah (also called Wah-hah-sah-she and Vah-hah-sah-she). Also there is evidence that he was known as Nun-pu-ah-se and also called Zah-ne-wah-lea, and there is some evidence that Wah-hah-sah-sah also went by the name of Wah-kah-she-wah-tse.

It is now claimed by the Cannon Group that Wah-hah-sah-sah (Wah-hah-sah-she or Vah-hah-sah-she) was one and the same person and the brother of Che-sho-wah-ti-an-kah (father of Alex Cannon) and Nun-so-wah-hu (father of E-ne-op-pe and Joseph Cannon), and that he was also the same person as Wah-kah-she-wah-tse (the father of Mo-se-che-he, decedent herein).

Testimony of various witnesses, corroborated by the payroll records, family registers, personal history cards, and documentary evidence, refute this claim.

As we have heretofore stated, the record clearly shows that Mo-se-che-he was born January 1, 1869. Her father died when she was about four years of age. That would be about 1873. That his death occurred about that time is corroborated in a measure by the fact that Wah-kah-she-wah-tse's name appeared on the rolls from 1871 to the spring of 1873 and never thereafter. Where he went, or what became of him, if he did not die about 1873, is not shown. It is also shown that Mo-se-che-he's mother died about three years after Mo-se-che-he's father died. This is borne out in a measure by the fact that Mo-se-che-he's name first appears on the pay rolls in 1878, when she was nine years of age, as the sister of Wah-shu-she-ta-an-kah, who, it appears, was the son of Gro-to-me, a sister of Hon-sah-me, the mother of Mo-se-che-he. Later she appears as the daughter of Wah-sha-she-ti-an-kah; in fact, she was his cousin according to the evidence as to the relationship of the Hum-pah-to-kah Group.

The June, 1883, pay roll record shows that Vah-hah-sah-she's name appears opposite No. 257. Then follows a notation that he died April 22, 1883. (It was the custom to make one payment after the death of a member of the tribe). Furthermore, the records shows that Wah-kah-sah-sah was indicted in the United States District Court of the Western District of Arkansas for larceny of cattle and that he entered a plea of guilty on April 15, 1881, and was sentenced to imprisonment for one year in the House of Correction at Detroit, Michigan. He was released and returned to the Reservation in 1882.

Thus, the record shows Wah-hah-sah-sah to have lived until April 1883, some ten years after Wah-ka-she-wa-tsi, the father of Mo-se-che-he, died. Furthermore, the record shows that Wah-hah-sah-she was 29 years of age April 22, 1883, when he died. If that be true, he was born in 1854 and was only 15 years older than Mo-se-che-he.

Notwithstanding the fact that there is evidence that Wah-sah-hah-she, Wah-hah-sah-sah, Nun-pu-ah-se or Zah-ne-wah-lea was also sometimes called Wah-kak-he-wa-she, he could not have been the same person as the Wah-kah-she-wah-tse who was the father of Mo-se-che-he (decedent). This being true, and it appearing that the whole case of the Cannon Group depends upon the claim that Wah-hah-sah-she or Wah-hah-sah-sah was one and the same person as Wah-she-wah-tse, the father of Mo-se-che-he, it cannot be said that the finding of the trial court that the evidence failed to show that the Cannon Group are first cousins of the decedent, Mo-se-che-he, or, in fact, that they are in any way related to the decedent, is clearly against the weight of the evidence.

Affirmed.